IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

CLEAN WATER ACTION COUNCIL OF
NORTHEASTERN WISCONSIN, INC.

        Plaintiff,

        v.                        No. 09-C-369

UTICA ENERGY, LLC,

        Defendant.

_____

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

_____

Plaintiff Clean Water Action Council of Northeastern Wisconsin, Inc. ("CWAC" or "Plaintiff") submits this brief in support of its Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rules 7.1 and 56.2.

## INTRODUCTION AND BACKGROUND

This citizen suit, filed by Plaintiffs on April 9, 2009, is for declaratory and injunctive relief and for the imposition of civil penalties, together with costs and fees, to abate and redress numerous ongoing violations of the Clean Water Act ("CWA") and the Wisconsin Pollutant Discharge Elimination System ("WPDES") Permit No. WI-0063649-01-0 ("Permit"), pursuant to which Defendant Utica Energy, LLC ("Utica" or "Defendant") discharges wastewater to a tributary of Sawyer Creek, in Winnebago County, Wisconsin. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶¶ 1, 7; Compl. ¶¶ 1, 8; Ans. ¶ 8.) Defendant's extensive and egregious violations of its Permit, including its unlawful discharges of temperature, total suspended solids ("TSS"), biochemical oxygen demand ("BOD5") and zinc, have contributed to the degradation

of Sawyer Creek and have injured the aesthetic and recreational interests of CWAC and its members.

By its motion for partial summary judgment, Plaintiff requests that the Court find Defendant liable for 1,307 days of violation of the CWA. Plaintiff's claims for additional violations of the CWA caused by Defendant and the determination of appropriate relief (including civil penalties) to be granted for Defendant's CWA violations remain for trial.

Defendant operates a corn ethanol production facility located at 4995 State Road 91, in Oshkosh, Wisconsin ("Facility"). (PPFOF ¶ 16; Compl. ¶ 12, Ans. ¶ 12.) Defendant's Facility processes approximately 50 million gallons of fuel-grade ethanol per year, and generates wastewater containing numerous pollutants known to be toxic to human, animal or aquatic life or otherwise harmful to water quality. (PPFOF ¶¶ 18, 28-56; Compl. ¶ 12; Ans. ¶ 12; Saul Aff. ¶¶ 8, 9, 33-35, Ex. 5, 6, 32-34.) The Wisconsin Department of Natural Resources ("WDNR") issued Defendant's Permit on June 30, 2008, and since that date Defendant has managed and discharged its wastewater (and other waste products that are not relevant to this action) pursuant to, and limited by, the terms and conditions contained therein. (PPFOF ¶¶ 17, 19; Compl. ¶ 21; Ans. ¶ 21; Saul Aff. ¶ 8, Ex. 5.) That Permit specifically restricts Defendant's discharge of a number of pollutants to the headwaters tributary of Sawyer Creek, in Oshkosh. (PPFOF ¶¶ 19, 23, 33-36, 41, 46-47, 54-56; Saul Aff. ¶ 8, Ex. 5.) Sawyer Creek flows approximately seven miles through the City of Oshkosh from Defendant's point of discharge before joining the Fox River between Lake Butte des Morts and Lake Winnebago, and is known by WDNR to support a warm water sport fishery. (PPFOF ¶¶ 19, 21-22; Saul Aff. ¶ 8, 9, Ex. 5, 6.)

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims specified in the complaint pursuant to the CWA's "citizen suit" provision, 33 U.S.C. § 1365(a)(1). The Eastern District of Wisconsin is the appropriate venue because Defendant's ethanol production facility is located within this District. 33 U.S.C. § 1365(c)(1). (PPFOF ¶ 2; Compl. ¶ 7; Ans. ¶ 12; Saul Aff. ¶ 8, Ex. 5.)

More than 60 days prior to filing this action Plaintiff gave notice of the violations alleged in the complaint and of Plaintiff's intent to file suit to address those violations to Defendant by letter dated February 4, 2009. (PPFOF ¶¶ 3-5, 7; Compl. ¶ 8, Ex. A; Ans. ¶ 8; Saul Aff. ¶ 29, Ex. 26.) Plaintiff also gave at least 60 days notice of its intent to bring this suit against Defendant to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA, the United States Attorney General, and the State of Wisconsin. (PPFOF ¶ 6; Compl. ¶ 8; Saul Aff. ¶ 29, Ex. 6.) Neither Defendant nor Plaintiff are aware of any civil or criminal action that has been commenced and is being diligently prosecuted by EPA or the State of Wisconsin against Defendant to abate the statutory, regulatory, or permit violations that form the basis for this complaint. *See* 33 U.S.C. § 1365(b)(1)(A) and (B). (PPFOF ¶ 9; Compl. ¶ 9; Saul Aff. ¶ 36.)

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the evidence contained in pleadings and admissible testimony and documents demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "mere existence of a scintilla of evidence" in support of the nonmoving party does not present a genuine factual dispute. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A

3

fact is material only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. Motions for partial summary judgment "serve the important function[] of narrowing issues for trial" and are widely favored. *Joseph P. Caulfield & Assoc. v. Litho Prod.*, 155 F.3d 883, 888 (7th Cir. 1998).

Summary judgment is especially appropriate on the issue of liability for violations of the Clean Water Act because "NPDES enforcement actions are based on strict liability, thus making intent and good faith irrelevant[.]" *Student Pub. Interest Research Group, Inc. v. Monsanto Co.,* 600 F. Supp. 1479, 1485 (D.N.J. 1985); *Kelly v. EPA*, 203 F.3d 519, 522 (7th Cir. 2000).


**ARGUMENT**

**I.      THIS COURT HAS SUBJECT MATTER JURISDICTION UNDER THE CITIZEN SUIT PROVISION OF THE CLEAN WATER ACT**.

      A.      Statutory Framework.

Congress enacted the Clean Water Act ("CWA" or "Act") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Through the CWA Congress set a national goal of eliminating "the discharge of pollutants into… navigable waters" by 1985. 33 U.S.C. § 1251(a). To advance this goal, the Act provides a comprehensive approach for the regulation of pollution discharged to waters of the United States, expressly prohibiting the "discharge of any pollutant by any person" without proper authorization, such as the authorization provided through a permit issued under section 402 of the Clean Water Act. 33 U.S.C. § 1311(a). Section 402 establishes the National Pollutant Discharge Elimination System ("NPDES") program, which authorizes EPA or a delegated State to issue discharge permits to point sources seeking to discharge pollutants into waters of the United States. 33 U.S.C. §§ 1342, 1362(12), (14). In Wisconsin, WDNR has been delegated

4

authority to operate the NPDES program, and it does so by issuing permits through the

Wisconsin Pollutant Discharge Elimination System ("WPDES").  33 U.S.C. § 1342(b); Wis.

Stat. §§ 283.001(2), 283.31.

Citizens[1] may enforce the CWA by filing a civil action, referred to as a "citizen suit," in

federal court against any person alleged to be in violation of an "effluent standard or limitation."

33 U.S.C. § 1365(a)(1).   That provision grants the district courts jurisdiction to enforce such

effluent standard or limitation, including terms and conditions of permits issued under the federal

NPDES program or a delegated state permitting program.  *Id*. § 1365(f)(6).   In a CWA citizen

suit, the district courts are authorized to award injunctive relief, civil penalties, and litigation

costs and fees.  33 U.S.C. § 1365(a), (d).  The CWA authorizes civil penalties in the amount of

up to $32,500 per violation per day for violations through January 12, 2009, and $37,500 per

violation per day for violations after January 12, 2009.  33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R.

§ 19.4.

Because the CWA prohibits the discharge of pollutants in violation of the terms of an

existing NPDES permit issued by EPA or a delegated state, an exceedence of an effluent

limitation in an NPDES permit is a violation of the CWA itself, and justifies the imposition of

remedies allowed under the Act's citizen suit provision.  *Friends of the Earth, Inc. v. Laidlaw*

*Envtl Servs. (TOC), Inc.* 528 U.S. 167, 174 (2000) ("*Laidlaw*"); *Atlantic States Legal Found.,*

---

[1] A "citizen" is defined by the CWA as "a person or persons having an interest which is or may
be adversely affected."  33 U.S.C. § 1365(g). This phrase is not itself a limitation on the
jurisdiction of the federal courts, but rather is "intended  . . . to allow suits by all persons
possessing [Article III] standing[.]" *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers
Ass'n,* 453 U.S. 1, 16 (1981) (internal citations omitted); *Friends of the Earth, Inc. v. Gaston
Copper Recycling Corp.*, 204 F.3d 149, 155 (44th Cir. 2000).  Plaintiff's Article III standing is
addressed in Section V., below.

*Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 818 (7th Cir. 1997); *U.S. v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1108 (W.D. Wis. 2001).

The Clean Water Act is a strict liability statute; negligence or knowledge of wrongdoing is not required for a court to award civil or other relief, and neither good faith nor lack of knowledge will provide a defense. *Kelly v. EPA*, 203 F.3d 519, 522 (7th Cir. 2000). Courts recognize that liability under the Clean Water Act can properly be established via summary judgment. *See Murphy Oil*, 143 F. Supp. 2d at 1112. Proof that the defendant violated the terms and conditions of the Clean Water Act or its WPDES permit is all that is necessary to establish a CWA violation. *Stroh Die Casting*, 116 F.3d at 818.

B.    Defendant's Violations of the Clean Water Act are Ongoing.

The CWA authorizes citizen suits only against dischargers that are "alleged to be in violation of" the Act. 33 U.S.C. § 1365(a)(1). Where the alleged violations are "wholly past" the citizen suit provision does not provide a court with jurisdiction; however, where a citizen-plaintiff makes "good-faith allegation[s] of continuous or intermittent violation[s]" the citizen suit may proceed. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) ("*Gwaltney I*"). "[A]n intermittent polluter – one who violates permit limitations one month out of every three – is just as much "in violation" of the Act as a continuous violator." *Id.* at 63. Plaintiff may prove an ongoing violation by "(1) proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.* 844 F.2d 170, 171-72 (4th Cir. 1988) ("*Gwaltney II*"); *see also Stroh Die Casting*, 116 F.3d at 820; *Natural Res. Def. Council, Inc. v. Texaco Ref. and Mktg., Inc.*, 2 F.3d 493, 502 (3d Cir. 1993). As explained in detail below,

6

Defendant in this case has violated each effluent limitation on one or more occasions since the complaint was filed on April 9, 2009. These post-compliant violations are sufficient to establish subject matter jurisdiction under the CWA.

II.     **DEFENDANT HAS ADMITTED TO 891 DAYS OF VIOLATION OF THE EFFLUENT LIMITATIONS IN ITS WPDES PERMIT AND THE CLEAN WATER ACT.**

The WPDES permitting scheme relies extensively on self-monitoring and reporting on the part of permittees to ensure compliance with the effluent limitations for each pollutant. WDNR requires permittees to fulfill these reporting requirements through the use of Discharge Monitoring Reports ("DMRs") that are submitted to the agency on a monthly basis. Wis. Admin. Code § NR 205.07(1)(r). These DMRs must be accompanied by a certification, signed by an executive officer or other authorized representative, which certifies the accuracy of the DMRs. Wis. Admin. Code § NR 205.07(1)(g).

Where exceedences or violations are indicated in a facility's DMRs, they are deemed to be admissions of those violations and are sufficient to establish Clean Water Act liability. *Murphy Oil,* 143 F.Supp.2d at 1112. "In an enforcement action, a defendant's [DMRs] constitute admissions regarding the levels of effluent that the defendant has discharged. If the [DMRs] show that the defendant has exceeded its [WPDES] permit limitations, then permit violations are established." *Id.* (quoting *United States v. City of Hoboken,* 675 F.Supp. 189, 192 (D.N.J.1987)); *see also Sierra Club v. Union Oil of Cal.* 813 F.2d 1480, 1492 (9th Cir. 1987); *Monsanto*, 600 F.Supp. at 1485. To assess compliance with a permittee's effluent limitations, a reviewing court need only "compar[e] the reported discharges to the applicable effluent limitations to determine in which instances the discharges exceeded the allowable limits." *Conn. Fund for the Env't, Inc. v. Upjohn Co*., 660 F.Supp 1397, 1409 (D. Conn. 1987).

Case 1:09-cv-00369-WCG   Filed 09/16/09   Page 7 of 25   Document 18

The CWA authorizes the award of civil penalties based on the number of "days of violation" of the Act. The CWA "speak[s] in terms of penalties per *day* of violation, rather than penalties per *violation*." *Chesapeake Bay Found. v. Gwaltney of Smithfield Ltd.* 791 F.2d 304, 314 (4th Cir.1986), *rev'd on other grounds*. Thus, under the Clean Water Act, "a violation of a weekly average limitation constitutes a violation for each day of the weeks in question and a violation of a monthly average limitation constitutes a violation for each day of the months in question." *Murphy Oil*, 143 F. Supp. 2d at 1112 (citing *Atlantic States Legal Found. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1139 (11th Cir. 1990); *Gwaltney I*, 791 F.2d at 314).

Defendant's Permit, at section 2.2.1, contains binding and enforceable effluent limitations for a number of pollutants that are discharged by Defendant at Outfall 001, including the pollutants temperature, biological oxygen demand ("BOD5"), total suspended solids ("TSS"), and zinc. (PPFOF ¶ 23, 33-36, 41, 46-47, 54-56; Saul Aff. ¶ 8, Ex. 5.) The effluent limitations that apply to Defendant's discharges of those four pollutants are summarized as follows:

| Pollutant | Effluent Limitation | Type of Limitation |
|---|---|---|
| Temperature | 85 degrees Fahrenheit (June – September)<br>65 degrees Fahrenheit (October – November)<br>60 degrees Fahrenheit (December – May) | Daily Maximum |
| Biological Oxygen Demand | 5.0 mg/L (May – October)<br>10.0 mg/L (November – April) | Weekly Average |
| Total Suspended Solids | 10mg/L | Monthly Average |
| Zinc (Sampled) | 690 µg/L | Daily Maximum |
|  | 110 µg/L | Weekly Average |
| Zinc (Calculated) | 0.98 lbs/day | Daily Maximum |
|  | 0.16 lbs/day | Weekly Average |

The WPDES program's monitoring and reporting obligations extend to Defendant. Section 5.1.1 of its Permit directs that "[m]onitoring results obtained during the previous month shall be summarized and reported on a Department Wastewater Discharge Monitoring Report." (PPFOF ¶ 24; Saul Aff. ¶ 8, Ex. 5.) Each of the DMRs submitted by Defendant between August

8

2008 and June 2009 are accompanied by an Electronic Discharge Monitoring Report

Certification, signed on behalf of Utica Energy, LLC by Mr. Steve Clements, attesting as

follows:

> I certify under penalty of law that the discharge monitoring data submitted to WDNR . . . and all attachments were prepared under my direction or supervision. I certify that this was done in accordance with a system designed to assure that qualified personnel properly gathered, evaluated and converted the information to electronic form. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, the information is, to the best of my knowledge and belief, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

(PPFOF ¶ 27; Saul Aff. ¶¶ 11-21, Ex. 8-18.)

Defendant's certified and signed DMRs for the months of July 2008 through June 2009

conclusively establish that Defendant violated the effluent limitations in its Permit on many

occasions, each of which is a separate violation of the CWA. Because many of the effluent

limitations exceeded by Defendant are given as weekly or monthly average limitations, Plaintiff

respectfully requests the Court to assess Defendant's liability in terms of days of violation for

each pollutant so limited

### A. Defendant has Admitted To At Least 39 Days of Violation of the Temperature Effluent Limitation in Section 2.2.1 of its Permit.

Each day Defendant exceeds the daily maximum effluent limitation for temperature is a

separate day of violation of Defendant's Permit and, therefore, the CWA itself. (PPFOF ¶¶ 54-

56; Saul Aff. ¶ 8, Ex. 5.) Between July 1, 2008 and continuing until at least May 28, 2009,

Defendant reported on its monthly DMRs 39 exceedences of its effluent limitation for

temperature, constituting admissions of 39 days of violation, of section 2.2.1 of its Permit.

(PPFOF ¶¶ 68-106; Saul Aff. ¶¶ 10-13,20, Ex. 7-10, 17.)

Defendant's temperature violations are summarized as follows:

| Date | Applicable Permit Limitation – expressed as a daily maximum (°F) | Reported Value from Defendant's DMRs (°F) |
|---|---|---|
| July 1, 2008 | 85 °F | 102.0 |
| July 2, 2008 | 85 °F | 97.3 |
| July 3, 2008 | 85 °F | 88.4 |
| July 5, 2008 | 85 °F | 92.6 |
| July 8, 2008 | 85 °F | 85.5 |
| July 9, 2008 | 85 °F | 103.3 |
| July 11, 2008 | 85 °F | 87.9 |
| July 14, 2008 | 85 °F | 87.9 |
| July 16, 2008 | 85 °F | 92.3 |
| July 17, 2008 | 85 °F | 91.4 |
| July 18, 2008 | 85 °F | 87.3 |
| July 19, 2008 | 85 °F | 85.2 |
| July 21, 2008 | 85 °F | 86.5 |
| July 23, 2008 | 85 °F | 86.3 |
| July 24, 2008 | 85 °F | 88.5 |
| July 26, 2008 | 85 °F | 88.6 |
| July 29, 2008 | 85 °F | 86.7 |
| July 30, 2008 | 85 °F | 89.0 |
| August 1, 2008 | 85 °F | 92.2 |
| August 2, 2008 | 85 °F | 85.5 |
| August 3, 2008 | 85 °F | 92.2 |
| August 8 , 2008 | 85 °F | 86.7 |
| August 9, 2008 | 85 °F | 92.1 |
| August 12, 2008 | 85 °F | 86.1 |
| August 17, 2008 | 85 °F | 89.4 |
| August 18, 2008 | 85 °F | 88.1 |
| August 27, 2008 | 85 °F | 85.2 |
| September 1, 2008 | 85 °F | 89.5 |
| September 2, 2008 | 85 °F | 88.2 |
| September 7, 2008 | 85 °F | 87.0 |
| September 10, 2008 | 85 °F | 87.8 |
| October 1, 2008 | 65 °F | 67.7 |
| October 3, 2008 | 65 °F | 65.3 |
| October 6, 2008 | 65 °F | 67.0 |
| October 24, 2008 | 65 °F | 65.8 |
| May 16, 2009 | 60 °F | 63.2 |
| May 20, 2009 | 60 °F | 63.5 |
| May 21, 2009 | 60 °F | 62.1 |
| May 25, 2009 | 60 °F | 62.8 |

Case 1:09-cv-00369-WCG   Filed 09/16/09   Page 10 of 25   Document 18

**B.** **Defendant has Admitted To At Least 182 Days of Violations of the BOD5 Effluent Limitations in Section 2.2.1 of its Permit.**

Each week Defendant exceeds the weekly average effluent limitation for BOD5 is seven days of violation of Defendant's Permit and, therefore, the CWA itself. (PPFOF ¶ 46-47; Saul Aff. ¶ 8, Ex. 5.)  Beginning on July 3, 2008 and continuing at least until June 24, 2009, Defendant reported on its DMRs 26 exceedences of the weekly average effluent limitation for BOD5, totaling 182 days of violation of section 2.2.1 of its Permit. (PPFOF ¶¶ 107-132; Saul Aff. ¶¶ 10-16, 18, 20-21, Ex. 7-13, 15, 17-18.)

Defendant's BOD5 violations are summarized as follows:

| Date | Applicable Effluent Limitation – expressed as a weekly average (mg/L) | Reported Value from Defendant's DMRs (mg/L) |
|---|---|---|
| July 3, 2008 | 5.0 | 56 |
| July 16, 2008 | 5.0 | 7.0 |
| August 12, 2008 | 5.0 | 65 |
| August 19, 2008 | 5.0 | 33 |
| August 27, 2008 | 5.0 | 9.3 |
| September 3, 2008 | 5.0 | 40 |
| September 9, 2008 | 5.0 | 20 |
| September 18, 2008 | 5.0 | 72 |
| September 23, 2008 | 5.0 | 23 |
| October 2, 2008 | 5.0 | 26 |
| October 9, 2008 | 5.0 | 23 |
| October 14, 2008 | 5.0 | 99 |
| November 4, 2008 | 10.0 | 18 |
| November 11, 2008 | 10.0 | 11 |
| November 18, 2008 | 10.0 | 25 |
| December 3, 2008 | 10.0 | 15 |
| December 12, 2008 | 10.0 | 28 |
| January 20, 2009 | 10.0 | 12 |
| January 27, 2009 | 10.0 | 28 |
| March 10, 2009 | 10.0 | 12 |
| May 5, 2009 | 5.0 | 8.8 |
| May 12, 2009 | 5.0 | 10.0 |
| May 19, 2009 | 5.0 | 15.0 |
| June 2, 2009 | 5.0 | 5.6 |
| June 9, 2009 | 5.0 | 5.1 |
| June 24, 2009 | 5.0 | 24.0 |

11

**C.    Defendant has Admitted To At Least 306 Days of Violation of the TSS Effluent Limitation in Section 2.2.1 of its Permit.**

Each month Defendant exceeds the monthly average effluent limitation for TSS is either 29, 30, or 31 days of violation of Defendant's Permit (depending on the number of days in that month) and, therefore, the CWA itself. (PPFOF ¶ 41; Saul Aff. ¶ 8, Ex. 5)  Beginning in July, 2008 and continuing at least until June, 2009, Defendant reported on its DMRs ten exceedences of the monthly effluent limitation for TSS, totaling 306 days of violation of section 2.2.1 of its Permit (PPFOF ¶¶ 133-142; Saul Aff. ¶¶ 10-16, 19-21, Ex. 7-13, 16-18.)

Defendant's TSS violations are summarized as follows:

| Date | Applicable Effluent Limitation – expressed as a monthly average (mg/L) | Reported Value from Defendant's DMRs (mg/L) |
|---|---|---|
| July 2008 | 10 | 34.05 |
| August 2008 | 10 | 20.25 |
| September 2008 | 10 | 31 |
| October 2008 | 10 | 17.4 |
| November 2008 | 10 | 16.9 |
| December 2008 | 10 | 15.9 |
| January 2009 | 10 | 10.525 |
| April 2009 | 10 | 11.1 |
| May 2009 | 10 | 22.35 |
| June 2009 | 10 | 12.725 |

**D.    Defendant has Admitted To At Least 364 Days of Violation of the Zinc Effluent Limitations in Section 2.2.1 of its Permit**

Each week Defendant exceeds the weekly average effluent limitations for zinc is seven days of violation of its Permit and, therefore, the CWA itself.  Beginning on July 2, 2008, and continuing through June 2, 2009, Defendant reported on its DMRs 52 exceedences of the weekly average effluent limitations for zinc, totaling 364 days of violation of section 2.2.1 of its Permit. (PPFOF ¶¶ 143-44, 146-53, 155-58, 163-65, 169-72, 176-90, 192; Saul Aff. ¶¶ 10-21, Ex. 7-18.)

Defendant's zinc effluent limitation violations are summarized as follows:

| Date | Applicable Effluent Limitation – expressed as a weekly average (μg/L) | Reported Value from Defendant's DMRs (μg/L) |
|---|---|---|
| July 3, 2008 | 110 | 890 |
| July 23, 2008 | 110 | 140 |
| August 5, 2008 | 110 | 130 |
| August 12, 2008 | 110 | 380 |
| August 19, 2008 | 110 | 210 |
| August 27, 2008 | 110 | 280 |
| September 3, 2008 | 110 | 130 |
| September 9, 2008 | 110 | 240 |
| September 18, 2008 | 110 | 130 |
| September 24, 2008 | 110 | 380 |
| October 2, 2008 | 110 | 300 |
| October 9, 2008 | 110 | 260 |
| October 14, 2008 | 110 | 120 |
| October 21, 2008 | 110 | 380 |
| October 28, 2008 | 110 | 410 |
| November 4, 2008 | 110 | 360 |
| November 11, 2008 | 110 | 250 |
| November 28, 2008 | 110 | 250 |
| December 3, 2008 | 110 | 270 |
| December 12, 2008 | 110 | 450 |
| December 17, 2008 | 110 | 430 |
| December 23, 2008 | 110 | 280 |
| January 6, 2009 | 110 | 170 |
| January 14, 2009 | 110 | 200 |
| January 20, 2009 | 110 | 270 |
| January 27, 2009 | 110 | 150 |
| February 26, 2009 | 110 | 270 |
| March 3, 2009 | 110 | 190 |
| March 10, 2009 | 110 | 210 |
| March 17, 2009 | 110 | 120 |
| March 24, 2009 | 110 | 160 |
| April 7, 2009 | 110 | 145 |
| April 15, 2009 | 110 | 160 |
| April 21, 2009 | 110 | 120 |
| April 28, 2009 | 110 | 210 |
| May 5, 2009 | 110 | 160 |
| May 19, 2009 | 110 | 330 |
| May 28, 2009 | 110 | 150 |
| June 2, 2009 | 110 | 150 |

13

| Date | Applicable Effluent Limitation – expressed as a weekly average (lbs/day) | Reported Value from Defendant's DMRs (lbs/day) |
|---|---|---|
| July 3, 2008 | 0.16 | 0.19 |
| September 24, 2008 | 0.16 | 0.31 |
| October 2, 2008 | 0.16 | 0.22 |
| October 9, 2008 | 0.16 | 0.19 |
| October 21, 2008 | 0.16 | 0.33 |
| October 28, 2008 | 0.16 | 0.30 |
| November 4, 2008 | 0.16 | 0.25 |
| November 11, 2008 | 0.16 | 0.20 |
| November 28, 2008 | 0.16 | 0.19 |
| December 3, 2008 | 0.16 | 0.18 |
| December 12, 2008 | 0.16 | 0.21 |
| December 17, 2008 | 0.16 | 0.22 |
| May 19, 2009 | 0.16 | 0.24 |

III.     **DEFENDANT FAILED TO NOTIFY WDNR IN WRITING OF ANY OF ITS EFFLUENT LIMITATION VIOLATIONS, RESULTING IN AN ADDITIONAL 129 SEPARATE VIOLATIONS OF ITS WPDES PERMIT AND THE CLEAN WATER ACT.**

Defendant's Permit requires Defendant to promptly notify WDNR, in writing, of "any violation of a maximum discharge limitation for any of the pollutants listed by the Department in the permit." (PPFOF ¶ 194; Saul Aff. ¶ 8, Ex. 5.)   This written notification of noncompliance must be provided within five days after Defendant becomes aware of the noncompliance or, with WDNR approval, with the submission of the next monthly DMR. (PPFOF ¶ 194; Saul Aff. ¶ 8, Ex. 5.)

Defendant failed to provide WDNR with the requisite written notification of noncompliance for each of the 129 separate and individual discharge limitation exceedences to which it has admitted through certified DMRs, as discussed above.  WDNR has certified, after a comprehensive search of WDNR's records by agency staff, that no such written notification of noncompliance for any of the effluent limitation exceedences exists. (PPFOF ¶ 196; Saul Saul

Aff. ¶¶ 5, 24, Ex. 2, 21.)  Defendant's failure to notify WDNR of each noncompliance

constitutes an additional 129 violations of section 5.2.1 of Defendant's Permit.

IV.     **DEFENDANT HAS FAILED TO SUBMIT REQUIRED MANAGEMENT PLANS, RESULTING IN 287 DAYS OF VIOLATION OF SECTIONS 4.4, 4.5, AND 4.7 OF ITS WPDES PERMIT AND THE CLEAN WATER ACT.**

Section 4 of Defendant's Permit requires it to submit a number of monitoring or

maintenance plans to WDNR by September 1, 2008.  (PPFOF ¶¶ 197, 199, 201; Saul Aff. ¶ 8,

Ex. 5.) Among these required plans are a Cooling Tower Maintenance Plan; Yard Maintenance

Plan; and a Land Application Maintenance Plan. PPFOF ¶¶ 197, 199, 201; Saul Aff. ¶ 8, Ex. 5.)

These plans serve an important compliance function by ensuring that Defendant has adequately

designed and prepared its various waste management and disposal systems to be able to

ultimately comply with the effluent limitations found in its Permit.  The purpose of the Cooling

Tower Maintenance Plan, for example, is to "specify how and why the cooling towers will be

maintained, cleaned and additives applied." (PPFOF ¶ 197; Saul Aff. ¶ 8, Ex. 5.)  Preparation of,

and compliance with, the various maintenance and management plans required by Defendant's

Permit will help keep pollutants out of Sawyer Creek.

Email correspondence from WDNR makes clear that Defendant has yet to submit a

Cooling Tower Maintenance Plan, Yard Maintenance Plan, or a Land Application Maintenance

Plan. (PPFOF ¶¶ 198, 200, 202; Saul Aff. ¶ 25, Ex. 22.)  Defendant failed to submit these plans

by the September 1, 2008 deadline in its Permit; had failed to submit these plans by the date this

complaint was filed; and, as of at least July 13, 2009, had still failed to submit these three

required plans.  (PPFOF ¶¶ 198, 200, 202; Saul Aff. ¶ 25, Ex. 22.)   WDNR, by practice, accepts

and approves of these plans on a rolling or continuing basis.  (*See, e.g.,* Saul Aff. ¶¶ 25-28, Ex.

22-25) (records showing WDNR approved other plans required by Defendant's Permit that were

submitted by Defendant on June 19, 2009). Therefore, each day upon which Defendant failed to submit a Cooling Tower Maintenance Plan, Yard Maintenance Plan, or a Land Application Maintenance Plan is a separate day of violation of its Permit and the CWA. Defendant failed to submit these plans to WDNR on each day between September 30, 2008 and July 13, 2009; Defendant is thus liable for 287 days of violation for each of the three un-submitted plans, for a total of 861 separate days of violation of its Permit and the CWA.

## V.     CWAC HAS STANDING TO BRING THIS CITIZEN SUIT

The requirement that a plaintiff have standing under Article III of the constitution to bring a lawsuit is designed to ensure that the plaintiff "has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy," *Sierra Club v. Morton,* 405 U.S. 727, 731 (1972), and to prevent federal courts from deciding abstract or purely hypothetical grievances. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 566 (1992). In CWA citizen suits, Article III standing requires a plaintiff to "differentiate himself from the mass of people who may find [the defendant's polluted discharges] to be objectionable only in an abstract sense." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000). To establish standing, an individual plaintiff must (1) have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that injury must be "fairly traceable" to the challenged action of the defendants; and (3) it is likely that the injury will be redressed by a favorable decision by the court. *Laidlaw,* 528 U.S. at 180-81 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992)).

Organizations or associations have Article III standing if:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 924 (7th Cir. 2008).

CWAC has organizational standing to bring this case as a representative of its members, demonstrated in part by the individual standing of one of its members, Mr. Frank Zuern, whose aesthetic and recreational interests in Sawyer Creek have been and will continue to be harmed by the polluted discharge from Defendant's Facility. Furthermore, because the protection of water quality in northeastern Wisconsin is germane to the purpose of CWAC, and because neither the claims asserted nor the relief requested in this case require the participation of any of CWAC's members in this lawsuit, CWAC has standing under Article III.

### A.   One of CWAC's Members Has Standing In His Own Right

Long-time CWAC member Frank Zuern has lived within a quarter mile of Sawyer Creek for approximately forty years. (PPFOF ¶¶ 203-05, 212; Zuern Aff. ¶¶ 3-4, 16.) During that time Mr. Zuern has observed, studied, and recreated on and near Sawyer Creek and used the Creek to provide aesthetic enjoyment. Mr. Zuern frequently observes bird and wildlife; walks along the Creek and through the natural areas supported by the Creek; and uses the Creek as a location for the peaceful enjoyment of nature. (PPFOF ¶¶ 213, 217-18, 223, 225-26,231; Zuern Aff. ¶¶ 11-18.) Mr. Zuern has suffered actual and imminent injuries to his cognizable interests in Sawyer Creek as a direct result of the challenged actions of the Defendant. (PPFOF 233-40; Zuern Aff. ¶¶ 19-24.) A favorable decision by this Court will redress those injuries, and thus Mr. Zuern has standing under Article III.

1.   <u>Mr. Zuern has suffered an injury in fact that is both actual or imminent, and concrete and particularized.</u>

Case 1:09-cv-00369-WCG   Filed 09/16/09   Page 17 of 25   Document 18

Courts have widely held that "injury to recreational or aesthetic interests constitutes a cognizable injury for purposes of standing." *Texas Indep. Producers and Royalty Owners Ass'n v. E.P.A.* 410 F.3d 964, 972 (7th Cir. 2005) (citing *Laidlaw,* 528 U.S. at 183; *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 886 (1990)). This injury may also exist "solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin,* 422 U.S. 490, 500 (1975) (internal quotation marks omitted). *See also Gaston Copper*, 204 F.3d at 156. Plaintiffs specifically asserting standing under environmental statutes "adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw,* 528 U.S. at 183 (quoting *Morton,* 405 U.S. at 735); *Franklin County*, 546 F.3d at 925.

Actual harm to the receiving waters need not be proven to establish standing. "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the *plaintiff*." *Laidlaw,* 528 U.S. at 181 (emphasis added). As the Ninth Circuit has noted, "to require actual evidence of environmental harm, rather than an increased risk based on a violation of the statute, misunderstands the nature of environmental harm, and would undermine the policy of the . . . [CWA]." *Ecological Rights Found. v. Pacific Lumber Co.,* 230 F.3d 1141, 1151 (9th Cir. 2000). Therefore, while demonstrated harm to the environment is ordinarily adequate to prove injury, it is not necessary. *See Gaston Copper*, 204 F.3d at 154; *Parker v. Scrap Metal Processors, Inc*., 386 F.3d 993, 1004 n.11 (11th Cir. 2004).

Those who live in close proximity to an area affected by actual or threatened environmental degradation will ordinarily demonstrate an injury in fact because they are more likely to be aware of and care about the natural environment at risk. *Ecological Rights Found.*, 230 F.3d at 1149; *Friends of the Earth v. Consol. Rail Corp*., 768 F.2d 57, 61 (2d Cir. 1985).

18

While plaintiffs must demonstrate that their aesthetic and recreational interests stem from more than just the occasional use of "unspecified portions of an immense tract of territory[,]" *Lujan*, 497 U.S. at 889, the "continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Laidlaw*, 528 U.S. at 184. Under this standard, Mr. Zuern has demonstrated a concrete injury to his aesthetic and recreational interests in Sawyer Creek.

Mr. Zuern has averred to two distinct and cognizable injuries that he has sustained at three separate locations along the length of Sawyer Creek. Mr. Zuern has experienced a decrease in the aesthetic and recreational quality of his use and enjoyment of Sawyer Creek as a venue for bird and wildlife observation, photography, walking, solitude and quiet reflection. (PPFOF ¶¶ 233-237; Zuern Aff. ¶¶ 19-21.) Mr. Zuern has noticed visible signs of pollution in the Creek, including cloudy or sediment-laden water; increased temperatures; and floating algae and other objectionable deposits that result from an excess of pollutants in Sawyer Creek. (PPFOF ¶ 233; Zuern Aff. ¶ 19.) These visible signs of pollution reduce Mr. Zuern's enjoyment of Sawyer Creek and injure his aesthetic and recreational interests in the Creek. (PPFOF ¶ 235-237; Zuern Aff. ¶ 19-21.)

Mr. Zuern's reasonable fears as to the present and future pollution in the Creek, including his personal knowledge of the existing pollution in the Creek, have diminished his use of Sawyer Creek. (PPFOF ¶¶ 235-39; Zuern Aff. ¶¶ 19-22.) Mr. Zuern has foregone use and enjoyment of Sawyer Creek, visiting the Creek less frequently as a result of his concerns about the Creek's water quality and, therefore, its suitability as bird and wildlife habitat, as subject matter for photography, and as a source of scenic beauty and recreational and aesthetic enjoyment. (PPFOF

19

¶¶ 235-239; Zuern Aff. ¶¶ 19-22.) This change in behavior is an injury in fact. *See Laidlaw*, 528 U.S. at 183; *Franklin County*, 546 F.3d at 925-26.

The ability of Sawyer Creek to provide habitat for the birds and wildlife that Mr. Zuern has enjoyed watching for decades is one of the underlying purpose of the CWA. The aesthetic values of Sawyer Creek near Mr. Zuern's home, a mere three and one-half miles downstream from Defendant's point of discharge, will be lessened by Defendant's pollution. (PPFOF ¶ 224; Zuern Aff. ¶ 16.) Mr. Zuern uses Sawyer Creek for aesthetic, recreational, and other purposes at several locations immediately downstream of and within three miles of Defendant's Facility (PPFOF ¶¶ 213, 217-18, 223, 225-26,231; Zuern Aff. ¶¶ 11-18), precisely the "affected area" that ultimately receives, or is at increased risk of receiving, the pollutants discharged by Defendant. *See Laidlaw*, 528 U.S. at 183. As demonstrated in his Affidavit and the Exhibits submitted by CWAC, Mr. Zuern is clearly able to demonstrate an injury to his protected interests in Sawyer Creek.

        2.     <u>The injuries sustained by Mr. Zuern are traceable to the actions of Defendant.</u>

The second element of Article III standing is causation; that is, the injury sustained by a plaintiff must be "fairly traceable to the challenged action" of the defendants. *Laidlaw*, 528 U.S. at 180-81; *Franklin County*, 546 F.3d at 926. It is not necessary that the defendant's actions be the sole cause of the plaintiff's injuries, or that a plaintiff would have undisturbed enjoyment of the environment but for the defendant's actions. *Pub. Interest Research Group of NJ, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990) Rather, it is sufficient in the CWA context that a defendant discharges a pollutant [which] . . . *contributes to* the kinds of injuries alleged[.]" *Id.*; *Texas Indep. Producers & Royalty Owners*, 410 F.3d at 974 (quoting *Gaston Copper*, 204 F.3d at 161) (emphasis added);; *Natural Res. Def. Council v. Sw. Marine*, 236 F.3d

985, 995 (9th Cir. 2000). Furthermore, Article III does not require the plaintiff prove "to a scientific certainty" that the defendant's conduct causes the precise injury alleged. *Powell Duffryn*, 913 F.2d at 72; *Nat. Res. Def. Council v. Watkins,* 954 F.2d 974, 980 n.7 (4th Cir. 1992); *Save Our Community v. E.P.A.*, 971 F.2d 1155, 1161 (5th Cir. 1992).

Courts have consistently held that the causation requirement of Article III is satisfied where the plaintiff offers proof of NPDES permit violations. "The Clean Water Act presumes unlawful discharges to reduce water quality because definite proof of the proposition is often nearly impossible." *Student Pub. Interest Research Group of NJ v. Georgia-Pacific Corp.,* 615 F.Supp. 1419, 1424 (D.N.J. 1985); *see also Laidlaw*, 528 U.S. at 184 (noting for standing purposes that it was "undisputed that Laidlaw's unlawful conduct--discharging pollutants in excess of permit limits--was occurring at the time the complaint was filed."); *Gaston Copper*, 204 F.3d at 157-158.

The injuries suffered by Mr. Zuern are fairly traceable to the excessive pollution discharges by Defendant. The injuries suffered by Mr. Zuern – including reduced enjoyment of Sawyer Creek that stems from the visible or noticeable pollution, and avoidance of Sawyer Creek due to concerns over the present and future water quality of the Creek – are traceable to the pollutant discharges from Utica in excess of its established Permit limitations.

More specifically, the pollutants discharged by Defendant in excess of its Permit limitations – including temperature, zinc, BOD5, and TSS – cause or contribute to the injuries suffered by Mr. Zuern. The discharge of temperature, or heated water, can lead to excessively warm waters in Sawyer Creek that can impact the suitability of those waters as fish, wildlife, and bird habitat; can affect the aesthetic and sanitary qualities of water; and can affect the biodegradation of organic material, such as objectionable algae, in surface waters. (PPFOF ¶¶

21

48-53; Saul Aff. ¶ 33, Ex. 32.)  The discharge of zinc, a heavy metal and bioaccumulating toxic substance, can result in acute or chronic toxicity in aquatic animal and plant species and the toxic pollution of surface waters.  (PPFOF ¶¶ 28-32; Saul Aff. ¶ 34, Ex. 33.)  The discharge of high BOD5 can reduce the amount of dissolved oxygen available to sustain aquatic life in surface waters.  (PPFOF ¶¶ 42-45; Saul Aff. ¶ 35, Ex. 34.)  The discharge of TSS can contribute to turbidity or visibly murky water; interfere with recreational uses of surface waters and reduce the aesthetic enjoyment of water; cause the smothering of invertebrate aquatic species; and reduce light penetration in the water.  (PPFOF ¶¶ 37-40; Saul Aff. ¶ 33, Ex. 32.)

Because they contribute to the visible and other detectible signs of water pollution, Defendant's excessive discharge of these pollutants decrease the frequency of Mr. Zuern's visits to Sawyer Creek, and decrease his enjoyment during his now less frequent visits the Creek, (PPFOF ¶¶ 233-237; Zuern Aff. ¶¶ 19-21.)  Defendant's discharge of harmful pollutants contribute to Mr. Zuern's reasonable fears that the water quality in Sawyer Creek has become and will continue to become increasingly polluted, making the Creek less suitable as animal and bird habitat and as a location for outdoor photography and the enjoyment of nature.  (PPFOF ¶¶ 238-239; Zuern Aff. ¶¶ 20-22.)  Mr. Zuern's has satisfied the causation element of Article III standing.

> 3.    A favorable decision from this Court would redress Mr. Zuern's injuries.

The third and final element of Article III standing is redressability: it must be likely that the plaintiff's injury will be redressed by a favorable decision.  *Laidlaw*, 528 U.S. at 180; *Franklin County*, 546 F.3d at 927.  Partial redress by a favorable decision will suffice for standing purposes; a plaintiff need not show that each and every injury will be relieved by a favorable decision.  *Franklin County*, 546 F.3d at 927 (citing *Mass. v. EPA*, 127 S.Ct. 1438,

1458). Indeed, even where redress comes in the form of a reduced probability of present or future injury, the requirements of Article III are satisfied. *Id.* at 928 (citing *Vill. of Elk Grove v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)).

Where a plaintiff's injury is in the form of actual or feared harm to water quality because of a defendant's permit violations, "an injunction will redress that injury at least in part[,]" regardless of whether the waterway will be "returned to pristine condition." *Powell Duffryn,* 913 F.2d at 73. An award of civil penalties will likewise redress a plaintiff's injuries, even where those penalties are paid to the federal government, because of their deterrent effect. *Laidlaw*, 528 U.S. at 185-86 (explaining that penalties can "encourage defendants to discontinue current violations and deter them from committing future ones[.]").

Plaintiff seeks injunctive relief and an award of civil penalties, among other remedies, in this citizen suit. Injunctive relief, if granted, would redress the injuries suffered by Mr. Zuern because it would require Defendant to comply with the terms of its Permit and the Clean Water Act, thereby stemming the excessive pollution discharged by Defendant's facility. *Powell Duffryn*, 913 F.2d at 73. An award of civil penalties would also redress Mr. Zuern's injuries because they would deter Defendant from future violations of its Permit and the Clean Water Act. *Laidlaw*, 528 U.S. at 186. (PPFOF ¶¶ 240; Zuern Aff. ¶¶ 23-24.)

**B.      The Interests Sought to be Protected by CWAC in This Case are Germane to the Organization's Purpose**

The second requirement for representational standing is that the interests sought to be protected by the action are germane to the purpose of the organization. *Hunt*, 432 U.S. at 343. CWAC is a non-profit membership organization, incorporated under the laws of the state of Wisconsin, with a stated and long-established mission of protecting the public health and the environment of northeastern Wisconsin; increasing public awareness of the many threats to water

23

quality; and building support for the improved management of Wisconsin's water resources. (PPFOF ¶¶ 10, 13; Compl. ¶ 10; Katers Aff. ¶¶ 2-4.) CWAC has been a party to numerous administrative and judicial proceedings, in both state and federal court, for the purpose of advancing its members' interests in clean water. (PPFOF ¶ 15; Katers Aff. ¶ 4.) This Clean Water Act citizen suit, the purpose of which is to protect Sawyer Creek, the Fox River, and Lake Winnebago from unnecessary and unlawful water pollution, is germane to the purpose of CWAC.

     **C.    Neither the Claims Asserted nor the Relief Requested Require the Participation of Individual CWAC Members.**

     The third prong of the *Hunt* test for representational standing "is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Commercial Workers Union v. Brown Group, Inc.*, 517 U.S. 544, 557 (1996). When the relief requested is injunctive or prospective in nature, the third prong is easily met. *Id.* at 553-54 (citing *Warth*, 422 U.S. at 515).

     The claims raised in this citizen suit derive primarily from self-reported violations found in Defendant's DMRs and other public records. Proof of the claims, therefore, does not depend on the involvement or participation of any CWAC members. Similarly, the appropriate remedies will be based largely upon the statutory remedies authorized by the CWA itself in the Act's citizen suit provision. The participation of individual CWAC members is therefore not required in this suit. *See, e.g., Franklin County*, 546 F.3d at 924-25 (noting that the Sierra Club has standing to bring a Clean Air Act citizen suit on behalf of its members).

## CONCLUSION

Plaintiff Clean Water Action Council of Northeastern Wisconsin has demonstrated Article III standing and has satisfied the jurisdictional requirements of the Clean Water Act's citizen suit provision. Because Defendant Utica Energy's self-reported violations, along with other official records available from the WDNR, clearly establish Defendant's CWA liability as a matter of law, Plaintiff respectfully requests the Court to grant its motion for partial summary judgment establishing the liability of Defendant for 1,315 days of violation of the CWA and enjoining Defendant from future violations of its Permit and the Act.

Respectfully Submitted this 16th Day of September, 2009.

MIDWEST ENVIRONMENTAL ADVOCATES

By: ___/s/ James N. Saul_____
James N. Saul, SBN 1067236
551 West Main Street, Suite 200
Madison, WI 53703
Phone: 608.251.5047
Fax: 608.268.0205
Email: jsaul@midwestadvocates.org

Attorney for Plaintiff Clean Water Action Council
of Northeastern Wisconsin, Inc.